UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID SHAND,

        Plaintiff,

v.                                             Case number 2:07-cv-13100
                                                    Honorable Julian Abele Cook, Jr.

WILLIAM C. MARTIN,

        Defendants.

<u>ORDER</u>

       This case arises out of a lawsuit by the Plaintiff, David Shand, who has accused the Defendant, William C. Martin, of (1) intentionally interfering with his business relationship, and (2) retaliating against him by inducing his employers to terminate him for exercising his right of free speech in violation of 42 U.S.C. § 1983. On October 12, 2007, he amended the complaint by charging Martin with having conspired with the management at radio station WTKA (Ann Arbor, Michigan) in a common plan and scheme to terminate his services as a broadcaster. Approximately twenty days later, Martin filed a motion to dismiss in which he asserted a claim of qualified immunity and, at the same time, urged the Court to grant a summary judgment in his favor.

I.

       The Plaintiff, David Shand, is a Michigan resident and former on-air personality for Sports Talk WTKA-AM 1050 ("WTKA"), a private radio station with an "all-sports" format. The Defendant, William C. Martin, is the Director for the athletic program at the University of

Michigan in Ann Arbor.[1]

According to the amended complaint, WTKA, in proclaiming itself to be "The Unofficial Voice of University of Michigan Athletics," broadcasts, analyzes and promotes sporting events (i.e., collegiate football, basketball and hockey games), and relies heavily upon its relationship with the University of Michigan for revenue and listener ratings.[2]

Shand was hired by WTKA as an on-the-air radio host from 2003 until his termination on April 23, 2007. In his opinion, he was highly qualified for this broadcast position because of his experiences as a former college and professional hockey player, college hockey coach, media commentator, sports agent, licensed attorney and adjunct professor at the University of Michigan. During the latter days of his employment at the radio station, Shand served as the primary host of a morning show ("In the Locker Room With David Shand") which featured sports talk, interviews and listener participation. Shand contends that he was encouraged by the radio station management to exude a humorous, opinionated, provocative and controversial on-the-air personality, all of which was designed to increase his appeal to the general listening audience. In Shand's view, the

---

[1]Shand acknowledges that Martin had no supervisory authority over WTKA, its station manager, (Robert Bolak), its program director (Brian Cowen) or any of the radio station staff personnel. *First Amended Complaint ¶ 25.* He also recognizes that the University of Michigan's athletic department is completely independent of the radio station, except for its limited license to broadcast collegiate football games and related programming through its contractual agent, Host Communications Company. *Id.*

[2]Shand says that the broadcasts of the football games and related programming were authorized by virtue of a licensing agreement with the University of Michigan and an entity ("Host Communications"). He also asserts that this licensing agreement places WTKA under the category of being a "flagship station" which is "designated to produce the football, men's basketball, women's basketball, and hockey productions." However, Martin disagrees with his comments, asserting that WTKA is only an "affiliate" or a radio station with rights to broadcast those events that were produced by its "flagship stations."

relationship between WTKA and the University of Michigan became extremely strained as Martin became increasingly irritated with his outspoken criticism of the athletic department.

The complaint, as amended, alleges that Martin informed the management at WTKA on April 19, 2007 that "he would not allow" the radio station to cover a charity golf match at the University of Michigan if Shand was assigned to cover the event as a broadcaster. Shand also contends that Martin threatened to terminate WTKA's right to broadcast the University of Michigan football games unless he was fired as a broadcaster with the radio station.[3] Several days later (April 23, 2007), Shand was relieved of his duties at WTKA.

II.

Under 42 U.S.C. § 1983, Shand must prove that Martin deprived him of a constitutional or federal statutory right while acting under the color of law.[4] *See Flagg Bros. v. Brooks,* 436 U.S. 149, 155-57 (1978); *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir.1995). Thus, a defendant must be a state actor or engaged in conduct that is "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

Here, Shand, in essence, claims that his employers at WTKA were induced by Martin to fire

---

[3]Citing to the contract between the University of Michigan and the Host Communications Company, Shand claims that Martin had substantial control over the right to terminate the radio coverage of its athletic contests by WTKA.

[4]Title 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding . . . .

3

him for exercising his fundamental right to freedom of speech. This assertion was met by Martin who has responded with a defense of qualified immunity, which has the effect of shielding certain public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald,* 457 U.S. 800, 806 (1982). In 2001, the Supreme Court observed that it is imperative for a court to resolve this issue early in the proceedings because such a position by a defendant amounts to an immunity from the lawsuit - not merely a defense to claims of liability. *Saucier v. Katz,* 533 U.S. 194, 200-201 (2001) (qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation.") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

In this case, Martin urges the Court to dismiss Shand's complaint, citing to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A dismissal under this Rule is warranted wherever the complaint "fail[s] to state a claim upon which relief can be granted." *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). When evaluating a Rule 12(b)(6) motion, the Court must construe the complaint in a light that is most favorable to the plaintiff and, at the same time, accept all of the factual allegations as being true. *Columbia Natural Resources, Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir. 1995). However, a complaint need not set forth a detail of all factual allegations, but it must offer more than mere labels, conclusions and a formulaic recitation of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level and the pleading must contain something more than a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.").

III.

In his amended complaint, Shand argues that Martin, in acts of retaliation against him, wrongfully and unlawfully induced his employers to terminate his services as a member of the WTKA staff in violation of his rights under the First Amendment. However, before considering whether Martin is entitled to qualified immunity for his allegedly retaliatory conduct, the Court must first seek to determine if Shand has advanced a legally cognizable cause of action against him.

In order to sustain a retaliation claim under the First Amendment, a plaintiff - such as Shand - must show that (1) he engaged in a protected conduct, (2) an adverse action was taken against him which would deter a person of ordinary firmness from continuing to engage in the alleged misconduct, and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).[5]

In addressing the first element under *Thaddeus-X*, Shand identifies three controversial statements, all of which were broadcast by WTKA and allegedly served as the impetus for the termination of his employment at the radio station: (1) his criticism of Martin for having hired two "disastrous" basketball coaches; (2) his criticism about the academic qualifications of those athletes who were enrolled in one of the University's departments; and (3) his description of an unnamed educator at the University of Michigan as being "unqualified" and having "slept her way to the top" of the department.

Shand's argument is interpreted by the Court as a claim that his speech, in which he criticized persons who are or were associated with the University of Michigan, was lawful and

---

[5]Inasmuch as Martin's currently pending motion does not dispute that the second and third elements of this test have been satisfied, the Court will confine its examination into whether the challenged conduct constituted an improper invasion into constitutionally protected conduct.

5

protected commentary about a public official who is employed by a public institution of higher learning. On this point, Shand has set forth a basis for his claimed violation of a constitutional right. The Court of Appeals for the Sixth Circuit has clearly recognized a private citizen's First Amendment right to criticize public officials. *See e.g., Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir. 1998); *See also, Leonard v. Robinson,* 477 F.3d 347 (6th Cir. 2007) ("the First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials") (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270,(1964)). Indeed, a private citizen's right to criticize public officials and policies has been held to reflect "the central meaning of the First Amendment." *Glasson v. City of Louisville,* 518 F.2d 899, 904 (1975).

However, Martin insists that Shand was not engaged in protected First Amendment conduct during any of the times that are relevant to this controversy. Rather, he generally argues that Shand did not speak as a private citizen, but in his capacity as an employee of the radio station. To support his position, Martin cites to an unpublished decision from the Western District of Virginia in *German v. Fox,* 06-00119, 2007 U.S. Dist. LEXIS 30895 (W.D. Va. 2007) (4th Cir. Jan. 23, 2008), in which the plaintiff filed a First Amendment retaliation lawsuit under § 1983 against his former employer in the private sector and a governmental unit of the State of Virginia. In *German* - as in this case - the plaintiff contended that he had been fired as a form of retaliation for exercising his rights to free speech under the First Amendment. Relying upon *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006), the court concluded that the defendant had spoken as a part of his job responsibilities - not as a private citizen. The *German* court reiterated the central holding in

*Garcetti*; namely, that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *German* at *16.

In *Garcetti*, the plaintiff had been employed as a calendar deputy for the Los Angeles County District Attorney's Office. 547 U.S. at 413. During a pending criminal case, he was asked by a defense attorney to review any inaccuracies in an affidavit that had been used to obtain a search warrant. The plaintiff, while acknowledging that it was not unusual for defense attorneys to make such a request of calendar deputies, conducted an investigation and subsequently wrote several memos in which he expressed some concerns about the affidavit to his supervisors. *Id* at 414. Although the District Attorney's Office continued to prosecute the case, the plaintiff was reassigned from his job as a calendar deputy to a trial deputy position, transferred to another courthouse, and denied a promotion. *Id* at 415. In denying relief to *Garcetti,* the Supreme Court declared that the plaintiff's expressions "were made pursuant to his duties as a calendar deputy." *Id* at 421 (noting that "the fact that [the defendant] spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case . . . distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline."). The Court further reasoned that the plaintiff had written the memo "because that is part of what he, as a calendar deputy, was employed to do" and that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id* at 421.

Here, the Defendant has encouraged the Court to extend the *Garcetti* analysis to Shand as a private employee. In Martin's opinion, *Garcetti* "did not alter the general rule that private

7

employees are generally entitled to less First Amendment protection than public employees." For several reasons, this analysis is unpersuasive.

First, it should be noted that the *Garcetti* Court limited its express holding to the First Amendment rights of *public* employees. 547 U.S. at 419, 421 (observing that its employee-speech jurisprudence protects the constitutional rights of public employees, ultimately holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes").

Second, unlike the plaintiff in *Garcetti,* there was nothing about Shand's commentary that was central to his employment as a radio show host. In essence, the identified remarks by Shand about Martin's hiring decisions raised questions about his performance as an athletic director for a public university. His commentary about the unnamed professor reflected a challenge to her qualifications to serve as a representative of a public institution who dealt with matters relating to student-athletes. Similarly, Shand's caustic remarks, which addressed the questionable rigors of the academic program for student athletes at the University of Michigan, reflected a criticism about the quality of education being sponsored by a tax-payer supported college. Despite this controversy and its overall relationship to athletics, none of these topics bore any necessary relationship to Shand's employment or the execution of his job.

WTKA, a private radio station, had hired Shand to serve as a co-host on a morning program which featured sports talk, interviews and listener participation. *First Amended Complaint at ¶* 9. WTKA's only content-related guideline was that, in discussing sports, Shand should be opinionated, provocative and controversial. *Id at ¶ 12-13.* There was nothing in his job description that called upon him to criticize Martin, the University of Michigan, or its athletic department. To

8

the contrary, given WTKA's self-perception as "The Unofficial Voice of University of Michigan Athletics," Shand seemingly walked a fine line when he openly berated a critical source of his employer's revenues. If Martin's argument is given its logical interpretation, the Court should treat Shand's controversial sports-related remarks as having been made pursuant to his official duties. Yet, such an approach would not only require the Court to render an overly-broad reading of *Garcetti*, but would unduly regulate the speech of controversial media personalities like Shand without regard to its actual content.

As an alternative form of relief, Martin claims that even if Shand did speak in his role as a private citizen (and not pursuant to his employment duties), his commentary did not involve matters of public concern. *See, Pickering v. Board of Education,* 391 U.S. 563 (1968) and *Connick v. Myers,* 461 U.S. 138 (1983). This public concern test was developed as a mechanism for balancing the First Amendment rights of government workers in their capacities as citizens against the need of a State as an employer to deliver critical services without unduly being hampered in the performance of its public functions. *Pickering* at 568; *Connick* at 147 ( "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior"). Whether a plaintiff's speech addresses a matter of public concern is a question of law. *Rahn v. Drake Ctr.,* 31 F.3d 407, 411 (6th Cir. 1994). In order to qualify as addressing a matter of public concern, a court must be able to "fairly characterize the expression as relating to any matter of political, social, or other concern to the community." *Id* at 411. If the speech does involve a matter of pubic concern, a court must then

9

address the *Pickering / Connick* balancing test. If it does not, no further inquiry by the court is necessary. *Id.*

In *Jenkins v. Rock Hall,* 513 F.3d 580, 586 (6th Cir. 2008), the Sixth Circuit recently held that the *Pickering / Connick* public concern test does not apply to private employees. The *Jenkins* Court noted that *Pickering* and *Connick* spoke only to the First Amendment rights of government employees. 513 F.3d at 586-587. The panel acknowledged the use of the test by the Supreme Court in those situations that are analogous to public employment in which free speech rights must be balanced against the need to effectively manage a government entity (e.g., cases involving government contractors). *Id* at 586. Significantly, the Court characterized those distinctions as "limited" when it reasoned that "applying the public concern test outside the public employment setting would require us to rend it from its animating rationale and original context." *Id* at 586-87. Following this analysis, the *Jenkins* court declined to use the public concern test in the case before it, which involved a dispute between parents and school officials. In light of the holding in *Jenkins,* the public concern test does not apply, given that Shand spoke as a private employee.[6]

To prevail on his § 1983 claim, Shand must also prove that Martin acted "under of the color law." 42 U.S.C. § 1983. Thus, he must show that Martin engaged in conduct that was "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *see also, United*

---

[6]Even if the Court had concluded that the public concern test did apply, Shand would still be obligated to satisfy its requirements. Shand made the comments over the airwaves for members of the general public to hear. Furthermore, he criticized the professional competence, as well as the quality of the decision-making abilities, of a public university's athletic director. The qualifications of a public educator, and the rigors of a public university's academic program for athletes were also made the subject of Shand's on-the-air commentary. Under the standards of *Rahn v. Drake, supra*, these topics can be fairly characterized as having applicability to the political, social and other concerns of the community.

10

*States v. Price*, 383 U.S. 787, 794, n. 7 (1966) ("In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment"); *Chemerinsky,* Federal Jurisdiction § 8.3 (5th ed. 2007). Martin argues that neither he nor the University of Michigan had any supervisory authority over Shand as a WTKA employee. Hence, he submits that he should not be held responsible for WTKA's decision - as a private actor- to terminate Shand.

However, Martin's view is inconsistent with well-settled law. In *Dennis v Sparks,* 449 U.S. 24, 29 (1990), the Supreme Court held that private individuals who conspire with government officials may be liable under § 1983. *Id* at 27-28 ("to act under color of state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting "under color" of law for purposes of § 1983 actions").[7] In this case, Shand has alleged that Martin induced his employer and its management staff to terminate him as a form of retaliation for the exercise of his federally protected rights under the First Amendment. *First Amended Complaint ¶ 43.* Shand specifically complains that his private employers acted "in concert" with Martin and/or conspired with him in a "common plan to consummate Martin's desire that plaintiff be terminated." *First Amended Complaint ¶ 35-37, 43- 46.* Contrary to Martin's assertions, these allegations are facially sufficient to support a claim under § 1983 that he engaged in state action / acted "under the color of state law." *Dennis v*

---

[7]A court may utilize one of four tests to determine whether a person was acting under color of state law; namely, (1) the public function test, (2) the nexus test, (3) the joint action test and (4) the state compulsion test. *Lugar*, 457 U.S. at 939. The formulation in *Dennis v. Sparks, supra,* reflects the joint action test.

*Sparks, supra.*

IV.

Having concluded that Shand has properly alleged a cause of action, the question now becomes whether Martin is entitled to qualified immunity. This analysis requires the courts to under take a two step process in order to resolve this issue. Initially, the courts are encouraged to assess whether a constitutional right has been violated. *Saucier, supra* at 200-01. If a constitutional right has been violated, the court must seek to determine whether it has been "clearly established," as defined by *Anderson v Creighton*, 483 U.S. 635, 640 (1987), i.e., a right about which a reasonable public official should have known. *Id.*

The first step in this case has been satisfied, in that the Court - in its assessment of this issue under the limiting standard of a motion to dismiss - has determined that Shand has properly established the violation of a constitutional right. The Sixth Circuit has recognized the fundamental right of a private citizen under the First Amendment to criticize public officials. *See e.g., Bloch v. Ribar, supra*. Shand's criticism of Martin and the University of Michigan falls within the ambit of protected speech under the First Amendment. Thus, the remaining question is whether this right is clearly established under *Anderson, supra.*

A government official who performs discretionary functions is generally shielded from liability under 42 U.S.C. § 1983 if his conduct does not violate clearly established constitutional or federal rights about which a reasonable person would have known. *Harlow, supra* at 818. The contours of a constitutional right in question must be sufficiently clear to notify a reasonable official that his conduct would constitute a violation. *Anderson*, *supra* at 640 (1987).

The Supreme Court has emphasized that it is not enough for a right to be clearly established

as a general proposition. As such, it must be clearly established in the "more particularized, relevant sense" of the "specific context of the case." *Saucier*, 533 U.S. at 201. In resolving this question, the Court "look[s] first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the] circuit, and finally to decisions of other circuits." *Daughtery v Campbell,* 935 F.2d 780, 784 (6th Cir. 1991). Yet, the plaintiff need not offer precedent which shows that the very action in question has been previously held unlawful. *Id.*; see also, *Hope v. Pelzer,* 536 U.S. 730, 740- 41 (2002) (salient question is whether the law at the time gives officials fair warning that their conduct is unconstitutional).

At the time of Martin's alleged misconduct, the law was clearly established that an act of retaliation against a citizen who had exercised his fundamental right of free speech constituted a constitutional violation which in turn could serve as the basis for a § 1983 action. *See generally, Bloch v. Ribar, supra* at 683 (denying qualified immunity defense because "the right to criticize public officials is clearly established"); *McBride v. Village of Michiana,* 100 F.3d 457, 461 (6th Cir. 1996) (finding law to be clearly established with regard to First Amendment rights of a television and radio station news reporter who criticized performance of several public officials); *Livingston v. Luken and City of Cincinnati, et. al.,* No. 04-3470, 2005 U.S. App. LEXIS 23393, *16-19 (6th Cir. October 26, 2005) (unpublished) (construing free speech under First Amendment as clearly established right for purposes of denying qualified immunity for defendants; plaintiff was perpetual critic of City's public officials and criticized officials on his radio show); *Warmus v. Hank, et. al.,* No. 93-1619, 93-1620, 1995 U.S. App. LEXIS 4208, *32-33 (6th Cir. February 28, 1995) (unpublished) (affirming clearly established right under First Amendment to criticize conduct of public officials regarding matters of public concern); (*Korb v. Lehman,* 919 F.2d 243, 247-48 (4th

13

Cir. 1991) (recognizing citizens' right to speak publicly on matters of public concern as "at the very heart of the First Amendment"). Inasmuch as the case law is clear that a person may not be punished for publicly criticizing a representative of the government, Martin is not entitled to qualified immunity.

V.

Martin also urges the Court to grant a summary judgment in his favor on all of Shand's claims. In 1986, the Supreme Court opined that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). At the same time, the language within Federal Rule of Civil Procedure 56© indicates that a motion for a summary judgment should be granted only if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." The burden is upon the movant to demonstrate the absence of a genuine issue of a material fact. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

In assessing a summary judgment motion, the Court must examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party. Fed. R. Civ. P. 56©. *See United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962); *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *Bender v. Southland Corp*., 749 F.2d 1205, 1210-11 (6th Cir. 1984). Thus, it is the responsibility of the Court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Hence, a summary judgment must be entered if (1)

14

the submitted evidence in support of the dispositive motion clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law," *id.* at 252, or (2) the opponent fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Upon such a showing, the non-moving party must act affirmatively in order to avoid the entry of a summary judgment. Fed. R. Civ. P. 56(e). Importantly, the presentation of a mere scintilla of supporting evidence is insufficient. *See Anderson*, *477 U.S. at 252*, quoted in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). Indeed, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

Martin has essentially denied all of Shand's substantive allegations. As an example, Martin emphatically rejects Shand's assertion that he had a discussion with any member of the management staff about his employment tenure at WTKA. He also denies that he retained any substantive control over the radio station's rights to broadcast the University of Michigan football games. To support his argument, Martin proffers the declarations of Bolak and Cowan, both of whom state that neither of them ever had any discussion about Shand's tenure at the radio station.[8]

---

[8]Bolak's Second Declaration states, in pertinent part:

4. To the best of my knowledge and recollection, I have never directly spoken with the Defendant in this case, William Martin, either in person, by phone, email or other written communication. I recall being present at one or more meetings where Mr. Martin was also present. At no such meeting was Mr. Shand discussed.

5. At no time did Mr. Martin, or anyone from the University of Michigan or on their behalf, request that WTKA-AM terminate the employment of Mr. Shand. At no time did Mr. Martin, or anyone from the University of Michigan or on their behalf, issue any kind of threat to WTKA-AM to terminate any broadcast rights if WTKA-AM did

15

Martin also submits his own declaration which, in essence, denies that he ever made any threat or undertook any action that was designed to adversely affect Shand's employment at WTKA. He has submitted the declaration of Bruce Madej, the Associate Athletic Director for Communications at the University of Michigan whose job responsibilities include overseeing the relationships between the school's athletic department and the media. In his declaration, Madej echoes Martin's contentions; namely, that (1) the University of Michigan does not have any contractual relationship with Shand's employer regarding the broadcasts of its football games, and (2) WTKA does not enjoy any "flagship station" status according to the contract with Host Communications. Martin also includes a form from Shand's personnel file which indicates that the challenged termination of his job was brought about because (1) of "other misconduct" and (2) he

---

not terminate Mr. Shand's employment.

6. The reasons for the termination of the employment of Mr. Shand had absolutely nothing to do with William Martin or the ability of WTKA-AM radio station to continue to broadcast University of Michigan football games.

7. I have been made aware of an allegation made by Mr. Shand in his law suit that William Martin communicated with me via email regarding Mr. Shand. I never received any email communications from Mr. Martin of any kind.

8. I have also been made aware of an allegation made by Mr. Sand in his law suit about an alleged email communication referring to Mr. Shand using a very derogatory term and purportedly demanding that Mr. Shand's employment be terminated if WTKA-AM radio wanted to continue to broadcast University of Michigan sporting events. I never received an email or other communication of that nature from Mr. Martin or anyone else at the University of Michigan.

Although the declaration by Brian Cowan is not as extensive as that of Robert Bolak, his averments are virtually identical, especially paragraphs 4, 5, and 6. However, Cowan's declaration does not include the assertions in paragraphs 7 and 8 of Bolak's statement.

"could not meet standards." Based on this documentation, Martin submits that Shand will never be able to prove the critical factual allegations of his amended complaint.

Shand has responded to Martin's motion by submitting his own set of supporting documentation in the form of his own affidavit,[9] along with similar sworn statements from Alicia Ping,[10] and Rebecca Bogoski.[11]  He also included a purported email exchange between Cathy Roglitz and Brian Cowan who wrote that "[i]f it is your desire that WTKA not be involved [with the golf outing] because of our morning show, I do need you to advise me as such," as "[w]ith our staffing levels, and in all fairness to our personalities, it is not possible to preclude anyones [sic] presence."  *Shand's Response, Exhibit E.*  Roglitz purportedly responded by noting, in part, that "the limitations are not on WTKA as a whole.  However, I have received a very strong directive from Bill Martin via Jamie Morris re: the participation of Dave Shand as recent as Tuesday morning prior to our meeting."  *Id.*  After Shand had been fired, Cowan wrote once again to Roglitz's message: "We have had a change in staffing here at WTKA and will be able to help you with your golf outing unabated."  *Id.*

---

[9] Shand's affidavit refers to a post-termination conversation with Brian Cowan who allegedly told him that "[the controversy] was between you and the Athletic Department, and we needed the Athletic Department more than you."

[10] The affidavit of Alicia Ping, an account executive for WTKA and Shand's wife, alleges that she saw Cowan apologize for firing her husband.  She also claims that Cowan also made reference to an argument with Martin, in which both men had a disagreement over the identity of the persons who should be put on the air by the radio station.

[11] The affidavit of Rebecca Bogoski, the business manager for WTKA, averred that approximately three to four days before his involuntary termination, Shand's personnel file did not contain any notices of counseling, misconduct, warning letters, or listener complaints of any kind. She contends that Bolak directed her to write "other misconduct" and "could not meet standards" as the reasons for Shand's discharge.

17

In response, Martin asserts that the affidavits which have been submitted by Shand were not made upon personal knowledge, as required by Fed. R. Civ. P. 56(e). Rather, he maintains that these affidavits rest upon multiple layers of inadmissible hearsay, speculation, and conclusory assumptions. Martin has also attached a declaration from Roglitz, who submits that, notwithstanding her email exchange with Cowan, "at no time did anyone from the University of Michigan athletic department communicate to me that they desired to see David Shand terminated from his employment with [WTKA] radio."

Martin has correctly pointed to the Federal Rules of Civil Procedure for the proposition that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). Under this Rule, any evidence that is submitted in opposition to a motion for summary judgment must be admissible into evidence. *See, e.g., Monks v. Gen. Elec. Co.*, 919 F.2d 1189, 1192 (6th Cir.1990). Therefore, the Court must disregard any evidence that is hearsay and irrelevant to the issue under scrutiny. *Dole v. Elliott Travel & Tours, Inc*., 942 F.2d 962, 968-69 (6th Cir.1991).

As Martin has suggested, some of the affidavits which have been submitted by or on behalf of Shand contain hearsay evidence that would be deemed to be inadmissible during a trial. Nevertheless, some of the statements that could be regarded as hearsay are more properly interpreted as impeachment evidence. For instance, Martin, Cowan and Bolak have collectively denied that Martin made any demands upon WTKA relating to Shand's employment status as a staff member of the radio station. Yet, there are portions of Shand's affidavit, as well as those within Ping's sworn statement, which facially tend to undermine the veracity of Cowan's

18

declarations. But even if the Court excluded those portions of the affidavits which contain hearsay statements, the record nevertheless contains other evidence that demonstrates the existence of a genuine issue of a material fact for purposes of a trial.

For instance, Shand submitted copies of e-mail messages between Roglitz and Cowan regarding the charity golf outing. In the very least, this exchange arguably sheds some light on the critical question of whether Martin harbored any animosity toward Shand because of his commentary at the radio station. Martin is dismissive of this evidence, construing it as a "complete red herring."[12] Yet, contrary to this response, this exchange of e-mail points to a genuine issue of a material fact regarding Martin's intent and state of mind toward Shand.

The parties also clearly disagree about the reasons why Shand was fired. Pointing to the declarations from Cowan and Bolak, Martin maintains that Shand's termination had "absolutely nothing to do with [him]" or the ability of WTKA to continue broadcasting the athletic contests at the University of Michigan. Shand disagrees, and through his own affidavit and that of Ping, offers evidence which facially appears to contradict Cowan's version of events. This evidence reveals an obvious factual dispute on a material element of the case.

The declarations from Martin, Cowan and Bolak all suggest that Shand's statements are untrue. However, Martin's use of these statements alone is not enough to demonstrate the absence of a genuine issue of a material fact. Upon review of all the evidence, and when construed in a light that is most favorable to Shand, the Court concludes that Martin's motion for summary judgment must be denied.

VI.

---

[12] Martin's Reply Brief at n.4.

For the reasons that have been set forth above, Martin's motion to dismiss must be, and is, denied. The Court finds that Martin is not entitled to qualified immunity at this stage of the proceeding. Furthermore, Shand's First Amended Complaint has sufficiently set forth a claim upon which relief may be granted.

Martin's motion for summary judgment must also be, and is, denied in its entirety. The Court finds that genuine issues of a material fact exist with regard to each of Shand's claims.

IT IS SO ORDERED

Dated: May 28, 2008   s/ Julian Abele Cook, Jr.
JULIAN ABELE COOK, JR.
United States District Court Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on May 28, 2008.

s/ Kay Alford
Case Manager